UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHRIS PAUTLER,                          )
                                        )
           Plaintiff,                   )
                                        )
      vs.                               )     Case No. 4:16-CV-00266 (CEJ)
                                        )
NANCY A. BERRYHILL[1], Acting           )
Commissioner of Social Security,        )
                                        )
           Defendant.                   )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social
Security Administration.

## I. Procedural History

On August 8, 2011, plaintiff Chris Pautler protectively filed an application for
supplemental security income with an alleged onset date of January 16, 2010. (Tr.
118–19, 10).[2]  Plaintiff's application was denied on initial consideration on
December 22, 2011, (Tr. 56–64, 67–71), and he requested a hearing from an
Administrative Law Judge (ALJ). (Tr. 74).

Plaintiff and counsel appeared for a hearing on July 22, 2013. (Tr. 10, 86).
That same day, plaintiff amended the disability onset date to February 16, 2011.
(Tr. 143). The ALJ issued a decision denying plaintiff's application on August 20,
2014. (Tr. 7–31). The Appeals Council denied plaintiff's request for review on
January 7, 2016. (Tr. 1–5). Accordingly, the ALJ's decision stands as the
Commissioner's final decision.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting
Commissioner Carolyn W. Colvin as the defendant in this suit.
[2] Plaintiff filed the application for supplemental security income pursuant to 42 U.S.C. §§
1381-1385.

## II. **Evidence Before the ALJ**

### A. **Disability Application Documents**

In an October 27, 2011, Disability Report (Tr. 146–54), plaintiff listed his disabling conditions as severe depression, sleep apnea, irritable bowel syndrome, anxiety, and low testosterone levels. (Tr. 147). An updated report (Tr. 173–78) submitted on February 8, 2012, indicated that beginning in February 2012, plaintiff experienced worsening depression and anxiety, as well as signs of paranoia. Plaintiff also noted worsened colitis and incontinence. (Tr. 173). Plaintiff stopped working on May 31, 2008, when he was laid off. (Tr. 148). He then collected unemployment benefits for some time before he "became disabled" on January 15, 2011. *Id.* In the fifteen years prior to the onset of his disability, plaintiff worked as a retail manager. He stayed in that position until May 2008. (Tr. 149).[3] To treat his health conditions, doctors prescribed numerous medications including, Adderall[4] to regulate sleep, a supplement for a vitamin B deficiency, testosterone injections for his testosterone deficiency, and Zoloft[5] for depression. (Tr. 150). Plaintiff's updated disability report reflected the same prescription medications, but did not include the vitamin supplement. (Tr. 175). Additionally, the stated reasons for medications

---

[3] Potentially conflicting information is presented in Lenora V. Brown's psychological assessment from December 5, 2011. Therein, plaintiff's prior employment history included work as a waiter, installer of fences, and preparer of insurance claims. (Tr. 248). Moreover, notes by Dr. Liss from April 4, 2012, indicate that plaintiff worked at Prudential for 2.5 years. (Tr. 260). A medical report from February 3, 2012, by Dr. Scott Groesch, signals that plaintiff previously worked at UPS. (Tr. 273).

[4] Adderall, or Amphetamine Salt Combo, is a combination of stimulants (amphetamine and dextroamphetamine) and is used to treat attention-deficit hyperactivity disorder and narcolepsy. http://www.webmd.com/drugs/drug-63164-Adderall+XR+Oral%2F.aspx?drugid=63164 (last visited May 13, 2014) and http://www.pdrhealth.com/drugs/adderall (last visited on May 13, 2014).

[5] Zoloft, or Sertraline, is a member of the SSRA class and is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. It is also used to relieve the symptoms of premenstrual dysphoric disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

changed: Adderall was reportedly prescribed for ADHD and testosterone for managing chronic fatigue. *Id.*

In a Function Report dated November 7, 2011, (Tr. 162–72), plaintiff stated that he lived in a house with his family. In response to a daily activities inquiry, plaintiff stated that after waking up he took his medications and then returned to bed for about an hour. (Tr. 162). After getting up again, he sometimes took care of his personal needs. But, sometimes he spent several consecutive days in bed, neglecting his personal care. *Id.* He did not list any hobbies but related that he spent most of his day watching television. (Tr. 166).

Plaintiff reported that his health conditions did not affect his ability to dress and feed himself, and he could use the toilet without assistance. (Tr. 163). He noted that sometimes he failed to bathe and care for his hair and he seldom shaved. *Id.* Plaintiff attributed these personal care habits to his depression. *Id.* Plaintiff's mother would "gently remind" him to care for his personal hygiene and take his medications. *(*Tr. 164).

Approximately once a week plaintiff "accomplish[ed] small tasks" such as laundry, housework, and yardwork. He needed encouragement to do so, due to low motivation. (Tr. 162, 164). On other days, plaintiff added, he might "just go in circles." (Tr. 162). When it came to handling money, plaintiff could count change and use a checkbook or money orders. (Tr. 165). He could not, however, pay bills or handle a savings account, as he would become "overwhelm[ed]." (Tr. 165). Plaintiff prepared his own meals three or four times a week. (Tr. 164). He tried to make meals quickly, rather than healthfully. *Id.* Plaintiff left his home about two or three times each week; he was able to walk and drive alone. (Tr. 165). He

shopped for clothes or groceries once every two weeks. He refrained from shopping more frequently because of his depression. *Id.*

Plaintiff reported that depression has also diminished his abilities to concentrate, absorb information, and socialize, noting that in the past he enjoyed sports and school. (Tr. 163, 166). Plaintiff reported limited social interaction—whether in person, on the phone, or on the computer. (Tr. 166). He has had difficulty getting along with others, as he is "easily annoyed and impatient." (Tr. 167). Plaintiff wrote that his "inability to communicate" manifested in "poor job function," and his "eventual[] termination" from a job. (Tr. 168). Plaintiff added that he experienced hearing[6] and memory difficulties, and that he struggled to complete tasks, understand, and follow instructions. (Tr. 167). He noted that his concentration, which could only persist for about fifteen to twenty minutes, limited his capacity to follow instructions. *Id.* Plaintiff also struggled handling stress and adapting to changes in routine. (Tr. 168). In his narrative, plaintiff attributed his disability to having been "born with the [umbilical] cord wrapped around [his] neck." (Tr. 169).

Plaintiff stated that he can walk a distance of only one block before requiring a ten-minute rest period. (Tr. 167). He also reported that sleep apnea reduced his daily coordination and functioning and exacerbated his depression and anxiety. (Tr. 169). He also added that irritable bowel syndrome (IBS) necessitated frequent bathroom visits. (Tr. 169).

In a Work History Report plaintiff provided a detailed description of his prior work experience. (Tr. 155–61). Plaintiff worked as a retail manager from an

---

[6] Plaintiff wrote that his hearing problems did not contribute to his disability. (Tr. 167).

unknown date until May 2008. (Tr. 156). He worked for eight hours each day, and for seven days each week, earning about $1,200.00 weekly. *Id.* His job responsibilities included "ordering and maintaining sales records," "payroll," and managing staff. *Id.* Moreover, his duties required that he employ machines, tools, and equipment, as well as technical knowledge or skills. (Tr. 156). He also wrote and completed reports. *Id.* The daily physical requirements of plaintiff's position involved about 5.5 hours of walking, 5 hours of standing, 3.5 hours of climbing, 2 hours of stooping, 0.5 hours of kneeling, 1 hour of crouching, 6.5 hours of handling, grabbing, or grasping large objects, 2.5 hours of reaching, and 2 hours of writing, typing or handling small objects. *Id.* On a daily basis he would lift and carry boxes of stock and furniture for up to 1,000 feet. *Id.* He frequently lifted objects weighing about fifty pounds or more. *Id.* Plaintiff supervised eight other employees in his position, and had some responsibility for hiring and firing.

**B.** **Testimony at Hearing**

Plaintiff testified that he lives with his 75 year old mother. He testified that his employment issues began when his former employer laid him off on May 31, 2008. (Tr. 36). He collected unemployment until January 2011. (Tr. 36). By February 16, 2011, plaintiff had ceased looking for work and collecting unemployment benefits. (Tr. 37). Plaintiff testified that he was disabled due to persistent depression, anxiety, panic attacks, chronic fatigue, and irritable bowel syndrome. (Tr. 39).

Plaintiff testified that he used a continuous positive airway pressure machine (CPAP) for sleep apnea. (Tr. 38). When asked about medication compliance,

plaintiff responded that he had stopped taking Lipitor[7] and was going to resume but his doctor was on vacation. Plaintiff stated that he was given Lipitor while in the hospital in May 2013 because doctors believed he "might have had a mini stroke." (Tr. 38).

Plaintiff testified that in high school he saw Jay Liss, M.D., "a couple times" for treatment of depression. (Tr. 40).  Plaintiff did not see Dr. Liss for several years after that, but resumed treatment "on and off" in the mid- to late 1980's. *Id*. For about 2½ or 3 years preceding the hearing, plaintiff had been keeping regular appointments with Dr. Liss. (Tr. 40–41).  Because of depression, plaintiff testified that feels he doesn't "have any way out" and that he doesn't "have a purpose in life because [he is] tired all the time." (Tr. 41-42).  He testified that depression had caused his inability to concentrate and follow written directions and his difficulty with reading comprehension. *Id*. Plaintiff reported that he had become forgetful and that lately his "memory isn't all that good."  *Id.*   As a further consequence of depression, plaintiff testified that he does not have "any social life anymore" and that he has "lost contact with all [his] friends." (Tr. 43). Additionally, he has days when he does not "feel like getting out of bed." *Id*. Plaintiff testified that "there might [be] three days in a row" when he does not "get out of bed or take a shower or do anything." (Tr. 45).

Plaintiff testified that anxiety makes him feel overwhelmed at times. (Tr. 46). He could not identify specific triggers for his anxiety but he believed it sometimes arose from thinking about his responsibilities. (Tr. 46, 47). He also attributed anxiety to an incident several years earlier when he was shot during an attempted

---

[7] Lipitor is used for the treatment of high cholesterol.  See Phys. Desk Ref. 2495-96 (60th ed. 2006).

robbery. *Id*. That experience led to fear of leaving home and suspicion of strangers in public places. (Tr. 48).

Plaintiff's described how chronic fatigue made him "dizzy and lightheaded." (Tr. 46). He also complained of resulting muscle aches and difficulties walking. *Id.* The onset of the fatigue was generally unpredictable. *Id*. Although plaintiff could still drive, fatigue sometimes interfered and he would have to pull over until it passed. (Tr. 54).

Plaintiff testified that he had sleeping difficulties for which he took Ambien.[8] {Tr. 49). Nevertheless, he still struggled to fall asleep due to racing thoughts and uncomfortable positioning to accommodate his CPAP machine. (Tr. 49–50). He woke up frequently throughout the night, preventing him from getting adequate rest. *Id.* As a result, he might not hear an alarm and might not get out of bed until anywhere between 10:00 a.m. and 2:00 p.m. (Tr. 50, 51).

On a typical day, plaintiff began by taking his medication—two Adderall, one Zoloft, and aspirin. *Id.* Because he was often still tired, he would go back to bed for another hour. *Id*. Upon arising, he might take a shower or take vitamin supplements or Metamucil. *Id*. During the afternoon and evening plaintiff cooked or ate meals. (Tr. 52). Plaintiff did not have any hobbies. *Id.* Instead, on a typical day he watched television or did chores such as cleaning, laundry, or mowing the lawn. *Id.* On occasion he shopped for groceries. *Id*. Plaintiff told the ALJ that he does not participate in any social activities or groups. However, in the two years preceding the hearing, he and his mother traveled to the Lake of the Ozarks several times and plaintiff went fishing there. (Tr. 43, 53-54).

---

[8] Ambien is used for the short-term treatment of insomnia. <u>See</u> <u>Phys. Desk Ref.</u> 2867-68 (60th ed. 2006).

**C.** <u>**Vocational Specialist Interrogatories**</u>

Following the administrative hearing, the ALJ propounded interrogatories to vocational specialist Gerald Belchick. (Tr. 198–202). The ALJ asked whether an individual born on July 25, 1962, with at least a high school education, who can communicate in English, with work experience as a retail sales manager, and who has the residual functional capacity (RFC) to perform a full range of work at all exertional levels but has nonexertional limitations of (1) routine repetitive tasks (SVP not to exceed 2), (2) occasional interaction with the public, and (3) occasional to frequent interaction with co-workers and supervisors, could perform prior past jobs and could perform any unskilled occupations with jobs that exist in the national economy. (Tr. 199–200). Belchick responded that the individual did have work experience within the past fifteen years but he could no longer perform the same position. (Tr. 198–99). He also opined that the individual could perform unskilled occupations in the national economy. (Tr. 200). Specifically, he noted that "there are a number of unskilled jobs that are simple, routine and repetitive and that do not involve frequent interaction with the public, co-workers or supervisors." (Tr. 202). Such positions included warehouse worker, commercial laundry worker, and cleaner. (Tr. 202).

**D.** <u>**Medical Records**</u>

**Pre-Onset Mental Health Records**

Jay Liss, M.D., met with plaintiff on March 19, 2009. (Tr. 220). Dr. Liss diagnosed plaintiff with depression and attention deficit disorder (ADD). *Id.* He wrote that plaintiff's medications included Zoloft and Adderall. *Id.* During that session, plaintiff told Dr. Liss that he was sleeping less. *Id.* Notes from June 10,

2009, reflect similar findings; but Dr. Liss added that plaintiff suffered from anxiety. (Tr. 219). On July 9, 2010, Dr. Liss wrote that plaintiff maintained the same dosage of Adderall and Zoloft and had a GAF of 60. (Tr. 218). Dr. Liss diagnosed plaintiff with ADD. *Id.* He further noted that plaintiff had to go to court due to a trespassing charge. *Id.* Records also indicate that plaintiff discussed his unemployment. *Id.* In his next set of meeting notes, Dr. Liss clarified that the trespassing charges were civil in nature. (Tr. 217). He also found a GAF of 60 and wrote that plaintiff had ADD and still held prescriptions for Adderall and Zoloft. *Id*

During a physical exam at Barnes Jewish Hospital on November 24, 2010, plaintiff reported that he took antidepressants and Adderall (for daytime fatigue). (Tr. 231). Scott D. Groesch, M.D. wrote of plaintiff's depression that he "seem[ed] stable on current medications." (Tr. 232).

### Post-Onset Mental Health Records

On March 9, 2011, plaintiff again saw Dr. Groesch. (Tr. 229–30). He noted that plaintiff presented with "normal sleep, mood, energy, sense of well-being and memory." (Tr. 229). He further wrote that plaintiff's depression was "stable on the above listed medications" (Adderall and Sertraline HCl). (Tr. 229–30). Dr. Groesch reported similar findings during a visit on March 30, 2011. (Tr. 227–28). He specifically stated that plaintiff's "depression is much improved and is followed by psychiatry." (Tr. 227). Moreover, he reported that plaintiff was "improving" and "well-controlled on current regimen." (Tr. 227–28).

Plaintiff attended a psychiatric appointment with Dr. Liss on May 20, 2011. Dr. Liss's notes indicate that the two discussed plaintiff's attorneys, as well as his medications. Dr. Liss found on Axis I that plaintiff had ADD. His GAF assignment on

Axis V is indecipherable. (Tr. 216). When plaintiff returned on September 16, 2011, Dr. Liss wrote that he was "feeling more depressed" and had night and day "mixed up." (Tr. 263). In addition he wrote that plaintiff felt "worried about his mother." *Id.* Again, Liss diagnosed plaintiff with ADD. *Id.* Plaintiff's prescription medications remained the same. *Id.*

During a November 17, 2011, visit to Dr. Groesch, plaintiff complained of "ongoing depression." (Tr. 225). At that time plaintiff maintained the same prescription regimen for his depression (Setraline HCl), but also had prescriptions for Adderall, Lipitor, and Depo-Testosterone shot. *Id.*

On December 5, 2011, Lenora V. Brown, Ph. D., conducted plaintiff's psychological evaluation. (Tr. 246–50). Dr. Brown reported that she reviewed plaintiff's medical records prior to the examination and noted that his chief complaints were severe depression, sleep apnea, IBS, anxiety, and low testosterone levels. (Tr. 246). Dr. Brown began by describing each of plaintiff's presenting issues. She first noted that plaintiff had no knowledge of a diagnosis of ADD, despite its repeated mention in medical records. *Id.* Plaintiff reported constant symptoms of depression including "fatigue, irritability, sense of worthlessness, sadness, lack of interest in engaging in social activities, decreased concentration," low self-esteem, guilt about being a burden, disturbed sleep, and increased appetite with fluctuating weight. (Tr. 247). Plaintiff also told Dr. Brown that he had struggled with anxiety since high school and depression since childhood. *Id.* He denied any suicidal attempts, excessive alcohol consumption, drug use, or inpatient admissions. *Id.* His medications at the time were Straline 100 mg, once daily; Adderall 30 mg, twice daily; and testosterone injections. *Id.*

Dr. Brown reported that plaintiff's grooming and hygiene appeared within normal limits. (Tr. 248). She did not observe "unusual motor activity or disturbance in gait." *Id.* With respect to plaintiff's ability to relate, Dr. Brown noticed that although his eye contact was poor, he succeeded in generating "some spontaneous conversation." *Id.* Plaintiff's cooperation with the examiner seemed fair and "no problems were noted in either receptive or expressive language domains." *Id.* Generally, plaintiff's speech was normal and Dr. Brown related that his rate, rhythm, and volume fell within normal limits. *Id.* Dr. Brown further opined that while plaintiff's affect appeared within normal limits, he reported that he felt "sort of closed in." *Id.* Dr. Brown's assessment of plaintiff's thought process found it generally normal—he denied paranoid ideation, as well as auditory or visual hallucinations. *Id.* Also, "[d]uring the evaluation he was coherent and his conversation was relevant and logical." *Id.* In the sensory tests, plaintiff successfully repeated five digits forward, named the current president and governor, named the past four presidents, and identified his birthplace, birthdate, and social security number. *Id.* He could not name the current mayor. *Id.* On a series of tests involving judgment (how to react to various scenarios), calculation (performing simple calculations and a serial threes task), proverb interpretation, and similarities and differences questions, plaintiff successfully answered all questions, and Dr. Brown rated him as "fair" in each category; he completed calculations without difficulty. (Tr. 248–49).

Next, Dr. Brown evaluated plaintiff's level of daily functioning. (Tr. 249). She reported that plaintiff told her he can pay bills and has a bank account. *Id.* He also stated that he can cook, use a microwave, and make a sandwich. *Id.* He shops for

groceries once a week, and was able to perform basic chores such as laundry, vacuuming, and cleaning the bathroom. *Id.* Plaintiff told Dr. Brown that "[o]n average" he is "capable of doing things about once a week." *Id.* In terms of his social functioning, plaintiff "reported a history of problems getting along with others in a work setting and acknowledged being terminated twice." *Id.* He also noted some friction with his mother. *Id.* Furthermore, he only reported television as a leisure and recreation activity. Plaintiff reported that he does not always care for his personal needs due to fatigue. *Id.* Finally, Dr. Brown observed that plaintiff's "concentration, persistence, and pace were fair during the duration" of the evaluation. *Id.*

Dr. Brown concluded that plaintiff's ability to perform activities of daily living and personal grooming were mildly impaired. Next, she found that his levels of social functioning and occupational functioning (ability to remember and carry out simple tasks, concentrate, persist for a normal period of time, and adapt to a normal workplace) were moderately impaired. (Tr. 250). She diagnosed plaintiff with depressive disorder, not otherwise specified, and assigned a GAF of 65. *Id.*

On January 11, 2012, Dr. Liss took notes on plaintiff's various conditions—depression, chronic fatigue, sleep apnea, low testosterone, and ADD. (Tr. 262). He also wrote that plaintiff had been denied disability benefits. *Id.* Dr. Liss indicated a GAF of 45. *Id.*

On February 1, 2012, Dr. Liss noted that plaintiff was applying for disability benefits. (Tr. 261). He also reported that plaintiff complained of "memory trouble" and stress. *Id.* Plaintiff received a GAF evaluation of 50 and a diagnosis of ADD. *Id.* In his April 4, 2012, evaluation, Dr. Liss reported diagnoses of ADD and depression.

(Tr. 260). The notes also reflect that plaintiff discussed various legal issues with Dr. Liss during that appointment. (Tr. 260). Dr. Liss assigned a GAF of 40. *Id.*

Plaintiff presented to Barnes Jewish Hospital on February 3, 2012, for a physical exam, during which he discussed his mental health complaints. (Tr. 273–74). Plaintiff told Dr. Groesch that he had long-standing depression, for which he was seeing a psychiatrist. He noted that he took Adderall for daytime fatigue, as well as antidepressants. (Tr. 273). Of plaintiff's depression, Dr. Groesch wrote that it "seems stable on current medications," and associated depression treatment with improving plaintiff's generalized fatigue. (Tr. 274).

Plaintiff met with Dr. Liss on May 31, 2012, at which time Dr. Liss diagnosed him with ADD and a thought disorder. (Tr. 259). Dr. Liss recorded several observations relating to plaintiff's ADD including "(1) poor attention," "(2) poor sustainability", "(3) doesn't listen well," "(4) poor follow through," "(5) poor organization," and "(6) loses thought." (Tr. 259). These notes appear to be copied from later meeting records taken on August 15, 2012. (Tr. 257). There was also some conversation about plaintiff's legal issues. *Id.* Dr. Liss assigned plaintiff a GAF of 50. *Id.*

On June 29, 2012, Dr. Liss wrote that plaintiff was "at the lake" and diagnosed plaintiff with ADD and a thought disorder. (Tr. 258). He noted a GAF of 40. Plaintiff's prescriptions were unchanged. *Id.*

Records from August 15, 2012, mirror those from May 31 noted above. (Tr. 257). Dr. Liss found that plaintiff had ADD and a GAF of 40. *Id.* Dr. Liss recorded the same GAF and ADD diagnosis on October 1, 2012. (Tr. 256). Topics of

discussion included plaintiff's siblings and use of the CPAP machine. *Id.* Dr. Liss's diagnoses remained consistent on November 14, 2012. (Tr. 255).

Plaintiff visited Barnes Jewish Hospital to follow up regarding his fatigue. (Tr. 271–74). Dr. Groesch noted that plaintiff "has some depression symptoms," which "are partially improved with use of the testosterone supplements." (Tr. 271). Psychiatric evaluation also included findings of "normal sleep, mood, energy, sense of well-being and memory." (Tr. 272). The assessment of plaintiff's psychiatric state concluded that he "seems stable on current medications," and will follow-up with a psychiatrist. *Id.*

On December 19, 2012, plaintiff and Dr. Liss discussed plaintiff's sleep issues and weight loss. (Tr. 254). Dr. Liss found that plaintiff had ADD and a GAF of 40. *Id.* This assessment remained unchanged at the appointment on January 23, 2013. (Tr. 253).

Plaintiff told Dr. Liss about his sleep apnea and overeating issues on February 1, 2013. (Tr. 252). He concluded that plaintiff had ADD and a GAF of 50. (Tr. 252). Notes from April 2, 2013, reflect a diagnosis of ADD. (Tr. 251).

On May 29, 2013, Dr. Liss completed a mental RFC questionnaire for plaintiff. (Tr. 265–70). Dr. Liss reported that he had seen plaintiff every one to three months beginning in 1993. (Tr. 265). On Axis I Dr. Liss found that plaintiff had ADD and depression. *Id.* He wrote that plaintiff's current GAF and highest GAF for the year were both 40. *Id.* Moreover, he noted that the treatments provided—therapy and medication—showed no response. *Id.* Medications were listed as Adderall and Zoloft. *Id.* Dr. Liss found that plaintiff's prognosis was poor and wrote that plaintiff could not "make useful decisions" and had a "strange perception of reality." *Id.* Dr.

Liss identified a host of different symptoms, such as (1) "anhedonia or pervasive loss of interest in almost all activities," (2) "appetite disturbance with weight change," (3) "decreased energy," (4) "generalized persistent anxiety," (5) "somatization unexplained by organic disturbance," (6) "mood disturbance," (7) "difficulty thinking or concentrating," (8) "paranoid thinking or inappropriate suspiciousness," and (9) "psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." (Tr. 266).   He found that plaintiff exhibited other symptoms, including (1) "perceptual or thinking disturbances," (2) "deeply ingrained, maladaptive patterns of behavior," (3) "unrealistic interpretation of physical signs or sensations associated with the preoccupation of belief that one has a serious disease or injury," (4) "sleep disturbance," and (5) "oddities of thought, perception, speech or behavior." *Id.*

During the mental RFC assessment, Dr. Liss also evaluated plaintiff's mental abilities and aptitude to do unskilled work. (Tr. 267). He determined that plaintiff would be unable to meet competitive standards for every area of evaluation.[9]   Dr. Liss wrote that plaintiff was "unable to make realistic, goal oriented decisions." *Id.*

_____

[9] Those areas included: the ability to remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention for two hour segment, maintain regular attendance and be punctual within customary, usually strict tolerances, sustain and ordinary routine without special supervision, work in coordination with or in proximity to others without being unduly distracted, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal work stress, and be aware of normal hazards and take appropriate precautions. (Tr. 267).

He also found that plaintiff did not have the mental abilities and aptitudes for semiskilled and skilled work, which includes the capacity to understand and remember detailed instructions, carry out detailed instructions, set goals or make plans independently of others, and deal with stress of semiskilled and skilled work. Specifically, Dr. Liss wrote that plaintiff had "poor cognitive ability." (Tr. 268). Next, Dr. Liss found that plaintiff's poor organization rendered him unable to meet competitive standards in mental abilities and aptitude needed to do particular types of jobs that require an employee to (1) interact appropriately with the public, (2) maintain socially appropriate behavior, (3) adhere to basic standards of neatness and cleanliness, (4) travel in unfamiliar places, and (5) use public transportation. (Tr. 268). Dr. Liss opined that plaintiff's psychiatric condition would exacerbate his experience of pain, would cause him to be absent from work more than four days per month, and would last at least twelve months. (Tr. 269). Finally, Dr. Liss found that plaintiff could not manage benefits in his own best interest. *Id.*

## Sleep Apnea Records

On November 24, 2010, Scott D. Groesch, M.D., recommended that plaintiff visit a sleep clinic for evaluation and treatment of his sleep apnea. (Tr. 232). On December 29, 2010, plaintiff visited the Clayton Sleep Institute for a polysomnography, or sleep evaluation, in connection with daytime sleepiness, difficulty maintaining sleep, and snoring and breathing issues during sleep. (Tr. 210–11). An evaluation found that plaintiff had "severe obstructive sleep apnea with severe disruption of sleep." (Tr. 210). The polysomnography showed that the problem was responsive to nasal CPAP – a CPAP titration study "revealed significant improvement in sleep-related obstructive breathing" and "[o]xygenation during

-16-

sleep." *Id.* Korgi V. Hegde, M.D., recommended that plaintiff continue to use the device along with a heated humidifier and saline nasal spray. *Id.*

Plaintiff also discussed his sleep apnea during his psychological evaluation with Lenora V. Brown, Ph. D., on December 5, 2011. (Tr. 246). He told Dr. Brown that he used a CPAP machine to improve sleep and that he took Adderall to combat daytime sleepiness. *Id.* Medical records from a visit to Barnes Jewish Hospital from February 3, 2012, and December 4, 2012, show that plaintiff continued to use the CPAP to treat sleep apnea. (Tr. 274).

**Testosterone Deficiency Records**

Scott D. Groesch, M.D., mentioned testosterone deficiency as a possible cause of plaintiff's fatigue on November 24, 2010. (Tr. 232). Recommended testing for testosterone levels was done on November 27, 2010. (Tr. 236). The test results showed that plaintiff had low testosterone levels. *Id.* On March 30, 2011, plaintiff presented for a follow-up appointment regarding his testosterone deficiency. (Tr. 227–28). Dr. Groesch noted that plaintiff had "no symptoms associated with low testosterone," just "his low mood, low energy, [and] general fatigue." (Tr. 227). The likely cause was assessed as an injury to his left testicle. (Tr. 227). An additional test was conducted at Barnes Jewish Hospital on March 31, 2011. (Tr. 242).

During a follow-up appointment on November 17, 2011, plaintiff received an intramuscular injection of testosterone. (Tr. 225). Dr. Groesch noted that plaintiff was "still feeling quite fatigued," and that he had not received the shots every four weeks. (Tr. 225). Accordingly, the doctor noted it was "tough to absolutely know whether dose is proper." (Tr. 225). During a psychological evaluation, plaintiff

described his low testosterone issue to Dr. Brown. Plaintiff reported that he had inconsistently received injections since February 2010. (Tr. 247). During a February 3, 2012, physical exam at Barnes Jewish Hospital, plaintiff reported that he continues to receive monthly testosterone shots but was unaware of their utility. (Tr. 273).

### Irritable Bowel Syndrome Records

Plaintiff complained of his "long-standing" irritable bowel syndrome during a visit to Barnes Jewish Hospital on November 24, 2010. (Tr. 231). Scott D. Groesch, M.D., noted that plaintiff had constipation and abdominal discomfort, but "usually no diarrhea, bright red blood per rectum, weight loss or other alarming symptoms." *Id.* During the psychological evaluation with Dr. Brown on December 5, 2011, plaintiff reported that he had suffered from IBS for ten years, but had received an initial diagnosis for the condition only seven years ago. (Tr. 246). He further told her that he was taking over-the-counter medication to increase his fiber intake and that he took laxatives. *Id.*

Plaintiff reported to Barnes Jewish Hospital for a physical exam on February 3, 2012. (Tr. 273–74). During that visit he discussed his irritable bowel syndrome symptoms. (Tr. 273). Specifically, he relayed "constipation predominant with some associated abdominal discomfort," but "usually [had] no diarrhea, bright red blood per rectum, weight loss or other alarming symptoms." (Tr. 273). Other notes indicated "no dysphagia, odynophagia, reflux, nausea, abdominal pain, change in bowel habits, melena, hematochezia, or jaundice," as well as no issues with "urine stream, polyuria, hematuria, nocturia, or incontinence." (Tr. 274). Dr. Groesch

recommended that plaintiff receive a colonoscopy if the "IBS and constipation progress," and prescribed Miralax. *Id.*

On December 4, 2012, plaintiff visited Barnes Jewish Hospital to discuss his ongoing fatigue. (Tr. 271). On that date, he also reported that he continued to suffer from IBS symptoms and constipation. (Tr. 272). Specifically Dr. Groesch noted "constipation and "some dyspepsia." *Id.* The report also notes that plaintiff has a normal urine stream, and "no polyuria, hematuria, nocturia, or incontinence." *Id.* Medical records indicate that plaintiff received a colonoscopy on January 15, 2013. (Tr. 276).

### III.  The ALJ's Decision

On August 20, 2014, the ALJ issued a decision containing the following findings with respect to plaintiff's application for disability benefits pursuant to Social Security Act § 1614(a)(3)(A):

1.  Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2013.

2.  Plaintiff did not engage in substantial gainful activity during the period from his amended alleged onset date of February 16, 2011 through his date last insured of December 31, 2013. 20 C.F.R. § 404.1571 *et seq.*

3.  Through the date last insured, plaintiff had the following severe impairments: major depressive disorder, alternately diagnosed as depressive disorder not otherwise specified ("NOS"), attention deficit disorder ("ADD") and thought disorder. 20 C.F.R. § 404.1520(c).

4.  Through the date last insured, plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525. 404.1526.

5.  Through the date last insured, plaintiff had the residual functional capacity to perform a full range of work at all exertional levels. He had nonexertional limitations: performing routine, repetitive tasks in an occupation with a Specific Vocational Preparation rating not exceeding

2. Also, he was limited to occasional interaction with the public, and occasional to frequent interaction with co-workers and supervisors.

6.    Through the date last insured, plaintiff was unable to perform any past relevant work. 20 C.F.R. § 404.165.

7.    Plaintiff was born on July 25, 1962, and was 49 years old, which is defined as a younger individual age 18-49. He subsequently changed age categories to an individual closely approaching advanced age on July 24, 2012. 20 C.F.R. §§ 404.1563, 404.2(c)(4).

8.    The claimant has at least a high school education and is able to communicate in English. 20 C.F.R. § 404.1564.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. *See* S.S.R. 82 – 41; 20 C.F.R. Pt. 404, Subpt. P, App. 2.

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed. 20 C.F.R. § 404.1569.

11.   The claimant was not under a disability, as defined in the Social Security Act, at any time from January 16, 2010, the alleged onset date, through December 31, 2013, the date last insured. 20 C.F.R. § 404.1520(g).

(Tr. 12–26).

## IV. <u>Legal Standards</u>

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997). "'Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (*quoting Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the

Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).The Commissioner has established a five-step process for determining whether a person is disabled. *See* 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. *Pate-Fires*, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. *Id.*

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." <u>Moore</u>, 572 F.3d at 523 (<u>citing</u> 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her

capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." *Moore*, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" *Id.* (*quoting Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); *Beckley v. Apfel*, 152 F.3d 1056, 1059–60 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, by comparing the RFC with the physical and mental demands of a

claimant's past work. 20 C.F.R. § 404.1520(f). The burden at step four remains with the claimant to prove her RFC and establish that he cannot return to her past relevant work. *Moore*, 572 F.3d at 523; *accord Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); s*ee also* 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. **Discussion**

Plaintiff claims that the ALJ erred in (1) determining that several of his conditions did not constitute severe impairments, (2) formulating plaintiff's RFC due to improper weighing of expert opinions and plaintiff's credibility, and (3) determining that plaintiff could perform a significant number of jobs in the national economy based on flawed hypothetical questions posed to the vocational expert.

### A. **Severe Impairment Analysis**

A severe impairment is an impairment or combination of impairments that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Conversely, an impairment is not severe if it is "a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3P, 1996 WL 374181 (1996).

Regulations define "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521. Examples of such abilities include, "(1) [p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) [c]apacities for seeing, hearing, and speaking; (3) [u]nderstanding, carrying out, and remembering simple instructions, (4) [u]se of judgment; (5) [r]esponding appropriately to supervision, co-workers and usual work situations; and (6) [d]ealing with changes in a routine work setting." § 404.1521(b).

The impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statements of symptoms." 20 C.F.R. § 404.1508.

"It is the claimant's burden to establish that his impairment or combination of impairments are severe." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, *see Hudson v. Bowen*, 870 F.2d 1392, 1395 (8th Cir. 1989), but it is also not a toothless standard. . ." *Id.* at 708. Here, the ALJ found that plaintiff's major depressive disorder, attention deficit disorder, and thought disorder constituted severe impairments pursuant to 20 C.F.R. § 404.1520(c). (Tr. 13).

### Sleep Apnea

First, plaintiff contends that the ALJ failed to "articulate a legally sufficient rationale for failing to consider the sleep apnea to be a severe medically determinable impairment." [Doc. #15 at 9]. To support this assertion, plaintiff only

offers that plaintiff's polysomnography "showed plaintiff had severe obstructive sleep apnea, with severe disruption of sleep." *Id.*

The ALJ concluded that plaintiff's sleep apnea was non-severe because plaintiff "consistently reported using his CPAP machine, and has not required any additional treatment of sleep." (Tr. 13). The CPAP machine "greatly improved sleep efficiency, architecture and oxygenation during sleep." *Id.* Moreover, the ALJ reasoned that doctors attributed any residual fatigue symptoms to plaintiff's depression and low testosterone. *Id.* The ALJ added that plaintiff had "not been advised to abstain from any activities because of his sleep apnea." *Id.*

Substantial evidence supported the ALJ's determination that plaintiff's sleep apnea was non-severe. Although diagnostic testing and other medical evidence confirmed plaintiff's sleep apnea complaints, the record shows that plaintiff's sleep apnea was responsive to the CPAP machine. Thus the ALJ properly decided that plaintiff's sleep apnea was non-severe. *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 446 (8th Cir. 2004) (affirming an ALJ who found that sleep apnea was not severe as it was "ameliorated by use of a CPAP machine"). "Impairments that are controllable or amenable to treatment do not support a finding of disability." *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009). Because plaintiff had "not been advised to abstain from any activities because of his sleep apnea," it did not appear that the condition hindered plaintiff from performing basic work functions. *See* (Tr. 13 (reasoning that "the objective medical evidence does not show that this impairment had more than a *de minimis* effect on the claimant's ability to engage in basic work activities.")). Accordingly, the ALJ did not err in deciding that plaintiff's sleep apnea was a non-severe impairment.

## Testosterone Deficiency

Second, plaintiff avers that the ALJ did not provide a legally sufficient explanation for determining that his testosterone deficiency was a non-severe impairment. [Doc. #15 at 10–11].

The ALJ found that repeat laboratory testing showed low levels of testosterone, but that the condition was not severe. (Tr. 14). In reaching this conclusion, the ALJ reasoned that "the claimant receive testosterone supplement injections only sporadically between March and November 2011." *Id.* And consequently, plaintiff's "physician noted it was difficult to assess the propriety of the testosterone dosing because of the claimant's treatment non-compliance." *Id.* The ALJ added that the medical record did not indicate that plaintiff's low testosterone resulted in any complications or more than minimally affected his ability to perform work activities. *Id.*

Substantial evidence supported the ALJ's conclusion that plaintiff's testosterone deficiency was non-severe. The record establishes that doctors attributed his fatigue in part to plaintiff's testosterone deficiency. (Tr. 225, 227, 231, 274). But, as the ALJ pointed out, doctors could not assess the effectiveness of the prescribed treatment  because of plaintiff's inconsistent compliance. Notably, "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling." *See Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (internal quotation and citation omitted). Furthermore, "[f]ailure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." *Id.* at 540 (internal quotation and citation

omitted); *see also* 20 C.F.R. § 416.930.[10] Therefore, the Court finds that the ALJ properly determined that plaintiff's testosterone deficiency was non-severe.

## Irritable Bowel Syndrome

Third, plaintiff argues that the ALJ did not provide sufficient reasoning for concluding that his irritable bowel syndrome (IBS) did not qualify as a severe medically determinable impairment. [Doc. #15 at 10–11].

The ALJ determined that although plaintiff had had symptoms of IBS since 2001, it did not qualify as a severe impairment. (Tr. 13). From the record, the ALJ gathered that plaintiff's IBS symptoms typically included constipation and abdominal discomfort, without consistent claims of diarrhea, incontinence, frequent bathroom usage, or weight loss. (Tr. 13). Moreover, the ALJ noted that plaintiff's condition did not require (1) any dietary changes, (2) any prescription medications, (3) any visits with a gastroenterologist, or (4) any emergent care or surgery. *Id.* She also reasoned that there was no evidence in the record that plaintiff's IBS more than minimally inhibited his ability to perform basic work activities. *Id.* And as this was a long-standing condition, the ALJ generally reasoned that a "condition that was not disabling during working years and has not worsened cannot be used to prove present disability." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994).

There is substantial evidence in the record to support the ALJ's decision. Medical records only catalog a history of constipation and abdominal pain associated with plaintiff's IBS. (Tr. 231, 272–74). Accordingly, the ALJ justifiably reasoned that "the claimant's allegations of greater symptoms and limitations from

---

[10] Critically, there is no evidence in the record that plaintiff's non-compliance with this testosterone regime related to his mental impairments. *See, e.g., Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010); *cf. Pates-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009).

this condition, including fecal incontinence and frequent bathroom usage are considered not fully credible." (Tr. 13). Although records do show that plaintiff received a colonoscopy on January 15, 2013, the precipitating cause and results of that procedure do not appear in the record. (Tr. 276). Furthermore, the ALJ properly considered that doctors only prescribed over-the-counter medication to treat plaintiff's IBS. *See Rankin v. Apfel*, 195 F.3d 427, 429–30 (8th Cir. 1999); *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993). Thus the ALJ properly determined that plaintiff's IBS was non-severe.

### B.    RFC Determination

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Id.* (citation omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (*quoting Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)). "'However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant.'" *Martise*, 641 F.3d at 932 (*quoting Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2020)). Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946).

To formulate plaintiff's RFC in this case, the ALJ considered the degree of limitation from plaintiff's severe impairments, in addition to the "credible symptoms arising from his non-severe impairments." (Tr. 19). He concluded that plaintiff did not have limitations with regard to physical exertional levels. But plaintiff's mental impairments limited him to "performing routine, repetitive tasks in an occupation with a SVP rating not exceeding 2." *Id.* Moreover, "[h]is combination of mental impairments also restricted him to occasional interaction with the public, and occasional to frequent interaction with co-workers and supervisors." *Id.* Plaintiff argues that this RFC did not accurately capture his limitations because the ALJ (1) disregarded severe impairments,[11] (2) improperly weighed expert medical opinions, (3) and incorrectly found plaintiff not credible.

## Expert Medical Opinion: Jay Liss, M.D.

Plaintiff argues that the ALJ should have accorded greater weight to the opinion of Dr. Liss. Specifically, he contends that the ALJ did not show inconsistencies between Dr. Liss's RFC opinion and his treatment notes.

According to 20 C.F.R. § 404.1527(c) an ALJ will consider several factors to decide the weight that should be afforded to a medical opinion, including the (1) examining relationship, (2) length of the treatment relationship and frequency of examination, (3) nature and extent of the treatment relationship, (4) supportability of the opinion, (5) consistency with the record as a whole, (6) specialization of the expert, and (7) any other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c)(1)-(6).

---

[11] As the Court has already found that the ALJ correctly conducted the step 2 analysis, it will not address this argument again.

A treating physician's opinion on the "nature and severity" of the impairments will receive controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2); *see also Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005). Part and parcel to this analysis is whether the treating physician's opinion is internally inconsistent – "[w]hen a treating physician's notes are inconsistent with his or her residual functional capacity assessment, we decline to give controlling weight to the residual functional capacity assessment." *Pirtle v. Astrue*, 479 F.3d 931, 933 (8th Cir. 2007); *see also Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009) (discrediting a treating physician's opinion that was inconsistent with his treatment records). Therefore, "[a]lthough a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as [a] whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). If the ALJ chooses to give the treating physician's opinion less weight, he should "give good reasons" for doing so. 20 C.F.R. § 404.1527(c)(2); SSR 96–2p, 1996 WL 374188 (1996).

In this case, the ALJ determined that "Dr. Liss's opinion is unsupported by his own treatment notes of the claimant, and the other medical evidence of record." (Tr.21). As a result, the ALJ gave little weight to Dr. Liss's opinion, even though he was plaintiff's treating psychiatrist. *Id.* The ALJ provided the following examples of internal inconsistencies in Dr. Liss's evaluation: (1) " . . . keeping the claimant on the same two psychotropic medications since June 2009, is not consistent with his opinion regarding the severity of the claimant's mental impairments," (2) Dr. Liss's notes do not "show he ever advised the claimant to participate in an intensive

outpatient program, to undergo inpatient psychiatric treatment, or to otherwise undergo any treatment beyond his routine psychiatric visits, which does not comport with the degree of symptoms and limitations articulated in his opinion," and (3) Dr. Liss' treatment notes never documented any "objective findings of abnormal affect, memory, concentration, attention, thought processes, thought content, or cognition." (Tr. 21).[12]

Moreover, the ALJ pointed to inconsistencies between the record as a whole and Dr. Liss's opinion: (1) reports by plaintiff's primary care physician describing plaintiff's depression as "stable;" (2) evaluation by a psychological consultative examiner that reported plaintiff's normal affect and  good performance on memory and concentration tests; (3) plaintiff's activities of daily living (laundry, paying bills, using a checkbook or money order, preparing meals, shopping, driving, going out alone, and vacationing at Lake of the Ozarks); and (4) Dr. Liss's suggestion that the limitations persisted since 1993, which is inconsistent with plaintiff's work history. (Tr. 21–22).

The Court finds that the ALJ properly discredited Dr. Liss's opinion. The aforementioned inconsistencies are not merely "lingering questions," as plaintiff's reliance on *Anderson v. Barnhart* suggests. 344 F.3d 809, 816 (8th Cir. 2003). Plaintiff's claim that Dr. Liss's notes are simply sparse  but not inconsistent with his later medical opinion is similarly unavailing. The Eighth Circuit has reasoned that "the credibility of a medical opinion is particularly suspect when it is based on incomplete evidence." *Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993) (quoting

---

[12] Given these specific findings of the ALJ, the Court finds no merit in plaintiff's argument that the ALJ failed to articulate any inconsistency between Dr. Liss's opinion and his treatment notes. *See* [Doc. #15 at 15].

*Vasquez v. Schweiker*, 701 F.2d 733, 736 (8th Cir. 1983)). Even without the internal inconsistencies between Dr. Liss's treatment notes and his opinion, "inconsistency with other evidence alone is sufficient to discount" a physician's opinion. *Goff v. Barnhart*, 421 F.3d 785, 790–91 (8th Cir. 2005).

Plaintiff also attempts to undermine the basis of the inconsistencies the ALJ found between Dr. Liss's opinion and the record as a whole. He first claims that Dr. Groesch's description of the plaintiff's depression as "stable," does not contradict Dr. Liss's opinion. Eighth Circuit case law does not generally interpret "stable" as plaintiff claims. *See Goff v. Barnhart*, 421 F.3d 785, 793–94 (8th Cir. 2005) (affirming the ALJ who considered medical records indicating that plaintiff "was stable" on antidepressants, and ultimately found plaintiff's depression was not "as limiting as [the plaintiff] alleged."); *see also Brown v. Astrue*, 611 F.3d 941, 949, 953–54 (8th Cir. 2010) (finding a psychiatrist's notes contradictory where he admitted the plaintiff had been "in relatively stable condition" and was "much improved," but also stated she could not "'tolerate full time employment. . .'"); *cf. Hensley v. Colvin*, 829 F.3d 926, 937 (8th Cir. 2016) (reasoning that "to describe symptoms as 'stable' is simply to state that they are not getting any better or worse; it says nothing about whether the symptoms are disabling."). Notably, this case is distinguishable from *Hensley v. Colvin*, as the ALJ did not put undue weight on notes that plaintiff's depression was "stable," "well-controlled," "much-improved," and "improving" (Tr. 232, 227–28, 272); rather, the ALJ here considered these notes in light of the whole record.

Plaintiff further argues that the ALJ should not have employed the opinions of Martin Isenberg, Ph.D. and Dr. Brown to discredit Dr. Liss. He argues that the ALJ

should not have accorded significant weight to Dr. Isenberg's opinion, because he was a non-examining physician. Plaintiff also challenges the ALJ's reliance on the opinion of Dr. Brown. Specifically, he argues that the Eighth Circuit "has stated many times that the results of the one-time medical evaluation do not constitute substantial evidence on which an ALJ can permissibly base the decision." [Doc. #15 at 12]. Plaintiff also contends that Dr. Brown's "report is an uninformed one at best," because she did not fully review "*all* the medical evidence of record."[13] *Id.* Finally, he generally states that each of these opinions, standing alone, did not constitute sufficient evidence to contradict the treating physician, Dr. Liss. (Tr. 12).

Although one medical opinion alone does not generally constitute "substantial evidence," to contradict a treating physician, the Eighth Circuit has carved out exceptions to this rule. *See Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007). "[A]n ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more through medical evidence," or "when that opinion conflicts with other substantial medical evidence contained within the record." *Prosch v. Apfel*, 201 F.3d 1010, 1013–14 (8th Cir. 2000). And here, the ALJ found that Dr. Liss's opinion conflicted with both Dr. Brown's *and* Dr. Isenberg's opinions, *in addition to* other evidence in the record. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (finding that the

---

[13] Plaintiff provides no authority for the contention that Dr. Brown's opinion was improper because she did not review records of other physical conditions. In fact, the regulations state that an opinion merits "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

ALJ did not solely rely on a consultative psychologist as the ALJ also "conducted an independent review of the medical evidence.").[14]

Accordingly, substantial evidence supports the ALJ's decision to give Dr. Liss's opinion little weight. *See Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005).[15]

## Plaintiff's Credibility

Plaintiff also argues that the ALJ improperly evaluated his credibility and "discredited his subjective complaints" without "good reasons." [Doc. #15 at 18]. More particularly, he takes issue with the ALJ's consideration of his daily activities: "[t]he ability to perform sporadic light activities does not mean that the [p]laintiff is able to perform full time competitive work." [Doc. #15 at 17 (citing *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998).].

In evaluating the credibility of plaintiffs, ALJs consider the *Polaski* factors: "the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication;" and "5. functional restrictions." *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Moreover, "[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a

---

[14] This also renders plaintiff's reliance on *Jenkins v. Apfel*, 196 F.3d 922 (8th Cir. 1999), as well as *Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003), inapposite.

[15] Even if the Court credited Dr. Liss, there is substantial evidence in the record to support an opposing opinion. Simply because two conclusions could be reasonably drawn, does not prevent the other from being supported by substantial evidence. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992); *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008); *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (reasoning that an ALJ's decision should only be disturbed if it falls outside the "available zone of choice") (internal quotation and citation omitted).

whole." *Wagner*, 499 F.3d at 851. The ALJ must "'make an express credibility determination explaining the reasons for discrediting the complaints.'" *Id.* (quoting *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). But, an ALJ is not "required to discuss each *Polaski* factor as long as 'he acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)).

When considering a plaintiff's daily activities as part of a credibility determination, an ALJ may look to "the quality of daily activities . . . and the ability to sustain activities, interests, and relate to others *over a period of time*' and the 'frequency, appropriateness, and independence of the activities must also be considered.'" *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007) (quoting *Reed v. Barnhart*, 399 F.3d 917, 922 (8th Cir. 2005)). In this vein, the Eighth Circuit has consistently emphasized that "[a] claimant need not prove she is bedridden or completely helpless to be found disabled." *Reed*, 399 F.3d at 923. Notably, if an ALJ "expressly discredits the claimant's testimony and gives good reasons for doing so, [a court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart,* 354 F.3d 710, 714 (8th Cir. 2003)).

Here, the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause most of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . ." (Tr. 23). According to the ALJ, records reflected plaintiff's conditions of depression, ADD, and a thought disorder, but, they did not show an "abnormal mood, affect, or behavior." *Id.*

Moreover, the ALJ explained, psychiatric and primary care treatment records do not show "objective findings of abnormal memory, concentration, attention, speech, psychomotor activity, thought content, thought processes, insight, judgment or cognition." *Id.* The ALJ considered that plaintiff maintained the same dosage of the same medications for "almost all of the alleged period of disability." *Id.* Given the unaltered prescriptions, observations that plaintiff's psychological conditions remained stable, and the absence of any need for emergent care, intensive outpatient program, counseling with a psychologist or therapist, or hospitalization, plaintiff's credibility regarding the severity of his conditions was further undermined. (Tr. 23–24). Additionally, the ALJ described a number of "unsubstantiated allegations" which "diminishe[d] the credibility of his allegations and testimony." (Tr. 24). Those allegations included panic attacks, bowel accidents, frequent bowel movements, problems hearing, spending days in bed due to depression, difficulty walking or engaging in exertional activities, and impaired motor skills. *Id.* Finally, the ALJ considered that plaintiff's medical conditions did not change around the date of his alleged disability's onset. (Tr. 25). That is, the onset of plaintiff's alleged disability coincided with the termination of his unemployment benefits in early 2011. *Id.*

The ALJ made an express credibility determination on the basis of inconsistencies in the record as a whole, and adequately reasoned through each of plaintiff's unsubstantiated symptoms. (Tr. 26). An ALJ can properly consider such inconsistencies. *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007). Plaintiff's stability on unchanged prescriptions also support the ALJ's credibility finding. Indeed, "[e]vidence of effective medication resulting in relief . . . may diminish the

credibility of a claimant's complaints." *Guilliams v. Barnhart*, 393 F.3d 798 (8th Cir. 2005).

The ALJ did not determine the plaintiff's credibility simply on the basis of contradictions between his daily activities and his subjective complaints, as plaintiff contends. *See* [Doc. #15 at 17]. It was appropriate for the ALJ to take plaintiff's daily activities into account. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Accordingly, because the ALJ gave good reasons for her credibility determinations, the Court will defer to her conclusions.

### C.     Affording Treatment

Plaintiff argues that plaintiff could not afford "proper evaluation of his medical complaints" because he did not have health insurance. [Doc. #15 at 14].

"A Social Security claimant should not be disfavored because he cannot afford or is not accustomed to seeking medical care on a regular basis. The failure to seek medical attention may, however, be considered by the administrative law judge in determining the claimant's credibility." *Basinger v. Heckler*, 725 F.2d 1166, 1170 (8th Cir. 1984).

The ALJ sufficiently addressed this argument in her opinion. She reasoned that despite plaintiff's alleged limited financial resources, he still attended regular psychiatry appointments, "which suggests some access to care." (Tr. 24). Moreover, the ALJ found that no referrals to specialists were reflected in the record. (Tr. 24). "The record does not show the claimant has been advised to undergo additional treatment that he has declined for financial reasons, or that he has attempted to avail himself of additional low-cost treatment providers or other social services." (Tr. 24); *see Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999).

Importantly, "'[w]hile not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem.'" *Whitman v. Colvin*, 762 F.3d 701, 706 (8th Cir. 2014) (quoting *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995)). Therefore, the ALJ's analysis regarding plaintiff's alleged financial limitations was sufficient. The Court will defer to her findings as "[i]t is for the ALJ in the first instance to determine a claimant's real motivation for failing to follow prescribed treatment or seek medical attention." *Whitman*, 762 F.3d at 706 (quoting *Hutsell v. Sullivan*, 892 F.2d 747, 750 n.2 (8th Cir. 1989).

### D. Objections to Vocational Expert

#### Hypothetical Questions

Plaintiff argues that as a consequence of an incorrect RFC determination, the ALJ's hypothetical questions to the vocational expert were incorrectly formulated. But, "[t]he ALJ's hypothetical question[s] properly included all impairments that were accepted by the ALJ as true and excluded other alleged impairments that the ALJ had reason to discredit." *Pearsall v. Massanari*, 274 F.3d 1211, 1220 (8th Cir. 2001). As discussed above, the ALJ did not err in her RFC determination, and therefore the hypothetical questions were proper. *See Martise v. Astrue*, 641 F.3d 909 (8th Cir. 2011). "

#### Opportunity to Submit Interrogatories

Plaintiff also claims that he submitted "alternative hypothetical questions" for the vocational expert, but they were "not forwarded to the vocational expert for [his] review." [Doc. #15 at 20]. He claims that as a consequence of this failure, the "response of the vocational expert does not represent substantial evidence." *Id.*

While the failure to submit additional hypothetical questions to an expert does not undermine the conclusion that this decision is supported by substantial evidence, (as the ALJ's hypotheticals captured a RFC determination supported by the record) the oversight could raise due process questions. This is because "'[p]rocedural due process under the Fifth Amendment requires that disability claimants be provided a full and fair hearing.'" *Passmore v. Astrue*, 533 F.3d 658, 663 (8th Cir. 2008) (quoting *Hepp v. Astrue*, 511 F.3d 798, 804 (8th Cir. 2008) (internal quotations omitted)). But, in *Passmore v. Astrue*, the Eighth Circuit held that "due process does not afford social security claimants an absolute right to cross-examine individuals who submit a report." 533 F.3d 658, 665 (8th Cir. 2008); *see also Hurd v. Astrue*, 621 F.3d 734 (8th Cir. 2010); *cf. Obermoeller v. Astrue*, No. 4:07-CV-1222-DJS, 2008 WL 4279616, at *14 (E.D. Mo. July 22, 2008) (holding that due process was violated when the ALJ did not provide notice to the claimant regarding evidence obtained post-hearing).

It is therefore necessary to determine whether the purported failure to submit interrogatories to the vocational expert deprived the plaintiff of due process. Here, the ALJ submitted the request for further interrogatories to plaintiff's counsel, thus affording him the opportunity to submit inquiries. That action comported with the notice requirement of due process. The next question is whether the failure to submit plaintiff's interrogatories violated his rights or constituted a failure to fully and fairly develop the record. *See Rahe v. Astrue*, 840 F.Supp.2d 1119, 1139 (N.D. Iowa 2011). Here, the ALJ's exclusion of these questions did not deprive the plaintiff of the opportunity to develop his case. *See Kelly v. Colvin*, No. 4:13-CV-

1891-CDP, 2015 WL 94252, at *4 (E.D. Mo. Jan. 7, 2015). Accordingly, plaintiff's due process rights were not violated.

## VI. <u>Conclusion</u>

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed.**

A judgment in accordance with this Memorandum and Order will be entered separately.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of March, 2017.